# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

January 24, 2019

To:     Laura A. Briggs
        UNITED STATES DISTRICT COURT
        Southern District of Indiana
        United States Courthouse
        Indianapolis , IN 46204-0000

| | |
|---|---|
| No. 17-2980 | DERRICK D. NEELY-BEY TARIK-EL, Plaintiff - Appellant<br><br>v.<br><br>DANIEL L. CONLEY, et al., Defendants - Appellees |

| Originating Case Information: |
|---|
| District Court No: 1:15-cv-01522-WTL-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:          No record to be returned

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                                        **Received by:**

_____1/24/2019_____

_____

Deputy Clerk, U.S.District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**

**CERTIFIED COPY**

January 2, 2019

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Before:
JOEL M. FLAUM, Circuit Judge
KENNETH F. RIPPLE, Circuit Judge
AMY C. BARRETT, Circuit Judge

| | |
|---|---|
| No. 17-2980 | DERRICK D. NEELY-BEY TARIK-EL,<br>Plaintiff - Appellant<br><br>v.<br><br>DANIEL L. CONLEY, et al.,<br>Defendants - Appellees |

| **Originating Case Information:** |
|---|
| District Court No: 1:15-cv-01522-WTL-DML<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

We **AFFIRM** the district court's judgment regarding Mr. Neely-Bey's claims for damages under the Free Exercise and Establishment Clauses. We also direct the district court to enter judgment for the defendants on Mr. Neely-Bey's claims for injunctive relief under the Establishment Clause. However, we **REMAND** the case to the district court for it to consider, in the first instance, Mr. Neely-Bey's claims for injunctive relief under the Free Exercise Clause and under RLUIPA. In undertaking this task, the district court first should ensure that the controversy has not become moot. The parties shall bear their own costs of this appeal.

The above is in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————————

No. 17-2980

DERRICK D. NEELY-BEY TARIK-EL,

*Plaintiff-Appellant,*

*v.*

DANIEL L. CONLEY, et al.,

*Defendants-Appellees.*



CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

———————————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-01522-WTL-DML — **William T. Lawrence**, *Judge.*

———————————————

ARGUED SEPTEMBER 7, 2018 — DECIDED JANUARY 2, 2019

———————————————

Before FLAUM, RIPPLE, and BARRETT, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Derrick D. Neely-Bey Tarik-El filed
this action against various officials at the Correctional Indus-
trial Facility ("CIF") in Pendleton, Indiana, and at the Indi-
ana Department of Corrections ("IDOC"). He alleged that
the defendants had prevented him from participating fully
in the worship services of the Moorish Science Temple of
America ("MSTA") held at the CIF, in violation of the Free
Exercise and Establishment Clauses of the First Amendment.

The district court screened the complaint under 28 U.S.C. § 1915A. It dismissed claims against Commissioner Bruce Lemmon and Superintendent Wendy Knight on Eleventh Amendment grounds and against Officer David Liebel on the ground that he had not participated personally in any of the actions against Mr. Neely-Bey. The district court allowed the damages claims against the remaining defendants to go forward. Following discovery, the remaining defendants moved for summary judgment on qualified immunity grounds. The district court granted the motion.

Before us, Mr. Neely-Bey contends that the district court failed to recognize that his complaint sought both damages and injunctive relief. He maintains that his injunctive relief claims must be reinstated because they are unaffected by sovereign or qualified immunity. Moreover, he contends that the district court erred in granting qualified immunity to the defendants on his damages claims.

We conclude that the defendants are entitled to qualified immunity on Mr. Neely-Bey's claims for damages under the Free Exercise Clause and the Establishment Clause and, therefore, affirm the district court's judgment with respect to those claims. We agree with Mr. Neely-Bey that the district court misread his complaint and that it clearly seeks injunctive relief as well as damages against the defendants. Moreover, the district court should have read Mr. Neely-Bey's pro se free exercise claim as seeking injunctive relief under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*. ("RLUIPA"). Consequently, we must remand so that the district court may consider whether injunctive relief should be granted on the free exercise claim. In addressing this matter, the district court first must deter-

mine whether the free exercise claim and RLUIPA claims are moot. If it determines that the claims are not moot, it should consider whether injunctive relief is warranted. As a matter of law, there is no basis for injunctive relief on the establishment clause claims, and we therefore direct the district court to enter judgment in favor of the defendants on those claims.

# I

# BACKGROUND

## A.

Until recently, Mr. Neely-Bey was incarcerated at CIF, where he was an active member of the MSTA congregation. The MSTA is a national religious organization founded by Prophet Noble Drew Ali.[1] Its most important group worship meeting is held on Fridays and includes recitation of the Moorish American Prayer, during which each adherent "stands, [and] faces the East."[2] After the prayer, a group leader reads the Divine Constitution, Bylaws, and verses from the Koran. Following the readings, the leader invites other participants to comment upon the readings. Finally, services conclude with the "Warning from the Holy Prophet" followed by another recitation of the Moorish American Prayer.[3] The MSTA also holds "Sunday School."[4] During

---

[1] R.81 at 97.

[2] *Id*. at 98.

[3] *Id*.

[4] It appears that, at some point, the MSTA group at CIF began meeting on Mondays instead of Sundays. *See id*. at 78 (Memo from Chaplain

(continued … )

2013 and 2014, Mr. Neely-Bey attended Friday Holy Day services and Sunday school. The records of the MSTA reflect that Mr. Neely-Bey regularly spoke at these meetings.[5]

In January 2013, Mr. Neely-Bey submitted an affidavit to IDOC Commissioner Lemmon. The cover letter stated that Mr. Neely-Bey was providing the affidavit to Commissioner Lemmon "so that we may come to an understanding [that] this affidavit is [b]inding on you and you[r] office."[6] It asserted that Mr. Neely-Bey was a "Sovereign Moorish National"; that he was not subject to the enactments of the United States Congress because he considered it to be a foreign power; and that he "squarely challenge[d] the fraudulent, usurping entanglement of JURISDICTION" over him.[7] The affidavit requested a hearing to establish the IDOC's authority over Mr. Neely-Bey. As a result of the affidavit, the IDOC classified Mr. Neely-Bey as a "Sovereign Citizen," which was designated as a "Security Threat Group."[8]

---

( … continued)

Smith setting forth how Mr. Neely-Bey may participate in "Monday meetings").

[5] *See* R.40; R.41; R.42.

[6] R.70-3 at 2.

[7] *See id*. at 3–4 (internal quotation marks omitted).

[8] In his brief, Mr. Neely-Bey claims that "the record does not support that he subscribed to such 'sovereign citizen' beliefs or that he intended to associate himself with such beliefs by identifying himself as a 'Sovereign Moorish National.'" Appellant's Br. 9. However, there is no evidence in the record that Mr. Neely-Bey contested or grieved this designation. Mr. Neely-Bey also does not maintain that sovereign citizens should not be considered a Security Threat Group. Thus, neither

(continued … )

Mr. Neely-Bey's affidavit made its way to Brother M. Doles Bey,[9] the MSTA minister who led the services at the CIF.[10] On April 6, 2014, Brother Doles Bey sent a memorandum on MSTA letterhead to, among others, David Liebel, Director of Religious and Volunteer Services Chaplains at the CIF; Brother V. Jones-Bey, Minister of Institutional Mission Affairs for the MSTA; and Mr. Neely-Bey. In his memorandum, Brother Doles Bey explained that sovereign citizens could not be participating members of the MSTA. The memo related that, at another institution, the MSTA had allowed an inmate with a "Security Group Threat" designation to facilitate a service, and as a result, the institution's MSTA group "was shut down."[11] Brother Doles Bey stated that

---

( … continued)

Mr. Neely-Bey's classification as a sovereign citizen, his designation as a member of a Security Threat Group, nor the restrictions placed on Security Threat Groups are at issue in this appeal.

[9] In his brief, Mr. Neely-Bey repeatedly addresses Brother Doles Bey as a "volunteer minister," suggesting that all of his ministry work is voluntary and that he is not an official representative of the MSTA. The record does not bear this out. In his complaint, Mr. Neely-Bey identifies Brother Doles Bey as "the Minister & I.D.O.C. volunteer of the Moorish Science Temple of America." R.1 at 4 (emphasis added). Moreover, according to IDOC policies, a volunteer like Brother Doles Bey must be "recognized by a religious body." R.81 at 37.

[10] Mr. Neely-Bey alleges in his complaint that IDOC Commissioner Lemmon forwarded the affidavit to the Director of Religious Services, David Liebel. R.1 at 3. Mr. Liebel presumably then passed it on to Brother Doles Bey, although there is not an allegation in the complaint to that effect. Neither party identifies any evidence in the record that establishes how the affidavit reached Brother Doles Bey.

[11] R.81 at 71.

Mr. Neely-Bey could attend services as a "guest," but that he could not teach or serve as a facilitator.[12]

On March 23, 2015, the Chaplain at the CIF, David Smith, sent a memo to Mr. Neely-Bey in which he stated that he had "received [Mr. Neely-Bey's] request to be added to the MST of A Religious Services group" and that he needed Mr. Neely-Bey "to understand that by returning to this group you agree to fully cooperate with and follow the April 6, 2014 sanctions placed on you by MST of A, Inc."[13] Specifically, Mr. Neely-Bey was forbidden from standing, speaking at, or facilitating any of the Friday services. He was allowed to speak when called upon during their Monday meetings; however, he could "not debate, instruct, dominate or speak against the teaching of the Prophet, the MST of A, Inc., or the U.S. Constitution."[14]

In late summer 2015, Chaplain Smith filed a "Report of Conduct" regarding Mr. Neely-Bey's actions during an MSTA meeting. Chaplain Smith stated that he had witnessed Mr. Neely-Bey "speak and openly participate during the Friday MSTA Holy Day meeting" and that these actions were in violation of the direct order that he had given to Mr. Neely-Bey, orally and in writing.[15] Chaplain Smith concluded that Mr. Neely-Bey's "actions … demonstrated his

---

[12] *Id.* at 72.

[13] *Id.* at 78. The parties do not explain why Mr. Neely-Bey, who had been an active member of the MSTA in 2013 and 2014, had to request to be added to the group in 2015.

[14] *Id.*

[15] *Id.* at 73.

intention to interfere and disrupt MSTA services on Holy Days."[16]

Officer Daniel Conley "screened" the conduct report,[17] and a hearing was held at Mr. Neely-Bey's request. At the hearing, chaired by Officer Richard Sidwell, it was determined that Mr. Neely-Bey had ignored an order by Chaplain Smith. Mr. Neely-Bey was given twenty hours of extra work to be completed in the next month. Although the determination makes no mention of it, Mr. Neely-Bey testified at his deposition, and the defendants conceded for purposes of summary judgment, that Mr. Neely-Bey "was suspended from [MSTA] meetings for one year."[18]

Mr. Neely-Bey appealed to CIF Superintendent, Wendy Knight. He argued that the sanction merely enforced the MSTA's ban on his participation in its services. Consequently, because "the State cannot get [in]volved in M.S.T. of A. affairs,"[19] the order could not be enforced. Mr. Neely-Bey's appeal was denied. In her explanation, Superintendent Knight stated:

---

[16] *Id.*

[17] Again, the parties do not direct us to any place in the record containing a description of the screening function. In admissions produced in response to Mr. Neely-Bey's requests, Officer Conley stated that he "had reservation[s] about the conduct report." *Id.* at 22. Neither in the admission, nor in any other place in the record, does Officer Conley explain the nature of his reservations.

[18] R.71 at 1.

[19] R.81 at 76.

You were charged with code 347 "Refusing to obey an order from staff" and you were found guilty by the DHB chairman.

I find the Report of Conduct to be descriptive and credible, and the statement provided by staff within the body of the report did support the finding. When any staff member gives you an order, you need to follow it. After you have followed the staff member's order, if you do not agree with that order or any order from staff, then you have a right to follow the department's grievance procedures. I find no errors in your case and the Report of Conduct is clear. You have provided me with no statements or evidence to cause me to change the decision of the Disciplinary Hearing Officer, therefore: your appeal is denied.[20]

**B**.

Mr. Neely-Bey filed this action in the district court against Commissioner Lemmon, Superintendent Knight, Director of Religious Services David Liebel, Chaplain Smith, Officer Conley, and Officer Sidwell. He alleged that he had been subjected to religious persecution when his affidavit was forwarded to the MSTA, that the CIF had become entangled in a religious dispute by enforcing the memorandum of Brother Doles Bey, and that the CIF defendants had violated his First Amendment right to free exercise when Brother Doles Bey's memo was enforced. As a remedy,

---

[20] *Id*. at 77.

Mr. Neely-Bey requested "that [he] receive $750,000 dollars" and that the defendants "cease all action against [him]."[21]

The district court screened Mr. Neely-Bey's complaint under 28 U.S.C. § 1915A.[22] The court determined that any claims for damages against Commissioner Lemmon and Superintendent Knight in their official capacities were barred by the Eleventh Amendment and therefore dismissed those claims. It also dismissed the claims against Mr. Liebel because he was not involved personally in the alleged deprivation. The court therefore instructed the clerk "to remove Bruce Lemmon, Wendy Knight, and David Liebel from the docket."[23] The court allowed the damages claims against Chaplain Smith, Officer Conley, and Officer Sidwell to proceed. The court's screening order was silent with respect to Mr. Neely-Bey's claims for injunctive relief.

Mr. Neely-Bey filed a motion to reconsider.[24] He argued that the Eleventh Amendment did not bar his claims against Commissioner Lemmon and Superintendent Knight because the claims were brought against the defendants in both their

---

[21] R.1 at 6.

[22] The district court initially dismissed Mr. Neely-Bey's complaint, believing that it was duplicative of another action that Mr. Neely-Bey had filed. *See* R.8. Mr. Neely-Bey filed a motion to reconsider, pointing out that the disciplinary action on which the present action is based is different from the ones at issue in the earlier action. *See* R.10. The court granted the motion to reconsider and conducted a merits screening under 28 U.S.C. § 1915A. *See* R.13.

[23] R.13 at 3.

[24] *See* R.17.

official capacities and their personal capacities.[25]
Mr. Neely-Bey did not argue, however, that the district court
should reinstate his claims for injunctive relief because sov-
ereign immunity did not operate as a bar to injunctive relief.
The district court denied reconsideration "[f]or the reasons
set forth in the screening entry."[26]

After discovery, the remaining defendants moved for
summary judgment. Relying on *Boy Scouts of America v. Dale*,
530 U.S. 640 (2000), the defendants submitted that it was
clearly established that the MSTA had a First Amendment
right to choose its membership, and the sanction against
Mr. Neely-Bey simply implemented that right. According to
the defendants, "failure to enforce the MST of A memoran-
dum would be the equivalent of forcing the MST of A to as-
sociate with Neely-Bey as a member in violation of MST of
A's First Amendment rights."[27] Moreover, once the MSTA
determined that Mr. Neely-Bey could not participate in its
services, IDOC was "prohibited from reviewing or question-
ing [its] religious decisions."[28]

The defendants also asserted that, if they had violated
Mr. Neely-Bey's rights, they were entitled to qualified im-
munity. They noted that a "diligent search of Seventh Circuit
and United States Supreme Court cases ha[d] yielded no

---

[25] He also argued that his claim against Mr. Liebel should be reinstated.
*See id*. at 2.

[26] R.19.

[27] R.71 at 8.

[28] *Id*. at 7 (citing *Hosanna-Tabor Evangelical Lutheran Church & Sch. v.
EEOC*, 565 U.S. 171, 186 (2012)).

cases with closely analogous facts that would establish that Plaintiffs' [sic] rights have been violated in this case."[29] Therefore, Mr. Neely-Bey had not met his burden of defeating the qualified immunity defense.

In response, Mr. Neely-Bey maintained that IDOC's enforcement of the limitations set forth in MSTA's memorandum violated the Establishment Clause and violated IDOC's own policies.[30] Regarding the defendants' claim that they were enforcing MSTA's associational rights, Mr. Neely-Bey believed that *Dale* was distinguishable because he was not asking to be appointed a leader of the MSTA, but only to participate fully in the services.

Turning to the issue of qualified immunity, Mr. Neely-Bey asserted that it was clearly established that IDOC could not restrict his right to practice his religion except when required by penological interests. Mr. Neely-Bey explained that participating in the Friday services was a key element of the MSTA faith, that Chaplain Smith understood this, and that disciplining him for participating in the Friday services constituted an unreasonable burden on his free exercise rights. He also claimed that the defendants had no legitimate penological interests in preventing his participation in Friday services. Turning specifically to Officers Conley and Sidwell, Mr. Neely-Bey noted that Officer Conley admit-

---

[29] *Id.* at 11.

[30] Mr. Neely-Bey specifically identified the policy providing that "[t]he Department does not endorse or recognize any particular denomination, sect, or faction as the 'correct' manner to practice a particular religion." *See* R.81 at 6.

ted that he had reservations about Chaplain Smith's conduct report, but nevertheless screened the conduct report. As for Officer Sidwell, Mr. Neely-Bey asserted that, at the time of the disciplinary hearing, Officer Sidwell was aware that the dispute was of a religious as opposed to disciplinary nature. Mr. Neely-Bey did not argue that, even if the doctrine of qualified immunity protected the defendants from liability for damages, his claims for injunctive relief nevertheless could proceed.

The district court granted summary judgment to the remaining defendants on the basis of qualified immunity. The court explained that, although "[t]he general principles of First Amendment law prohibiting officials from placing a substantial burden on the free exercise of religion by inmates are clearly established, … the qualified immunity defense turns on whether the application of those principles to the circumstances faced by the defendants was clear at the time."[31] "Here," the court explained, Mr. Neely-Bey could not "prevail in his effort to overcome qualified immunity by relying on general principles of First Amendment right[s]" because "[t]he Supreme Court has directed that '"clearly established" law is not to be defined at a high level of generality.'"[32] The court therefore entered judgment for the defendants.

---

[31] R.84 at 7.

[32] *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

## II

## DISCUSSION

**A. Free Exercise**

### 1. Claim for Damages

Mr. Neely-Bey first submits that the district court erred in concluding that the defendants were entitled to qualified immunity for damages related to his free exercise claim. The principles governing this question are well-settled. Qualified immunity shields government officials from civil "liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A qualified immunity determination comprises two inquiries; we must determine (1) "whether the plaintiff's allegations make out a deprivation of a constitutional right," and (2) "whether the right was clearly established at the time of defendant's alleged misconduct." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). We are permitted to skip the first inquiry and proceed directly to the question whether a particular right was clearly established. *See, e.g.*, *Whitlock v. Brown*, 596 F.3d 406, 408 (7th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). This is the approach that the district court took, and the defendants urge that we affirm the district court's judgment on this basis.

As we frequently have explained, a clearly established right is one that "is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zim-*

*merman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "[A] case directly on point," however, is not required. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established … .'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). "This inquiry '"must be undertaken *in light of the specific context of the case, not as a broad general proposition*."'" *Id.* (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Here, the district court observed that there was no governing law "directly establishing that the defendants' conduct in this case, where state officials enforced a ban from participating in religious activities that was put in place by the religious entity itself, violated Mr. [Neely-Bey's] rights under the First Amendment."[33] Mr. Neely-Bey believes, however, that the law "provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'"[34] According to Mr. Neely-Bey, the law was clearly established that a prison official cannot deny a prisoner's free exercise rights based on the official's understanding of the tenets of a particular faith. He relies principally on *Grayson v. Schuler*, 666 F.3d 450 (7th Cir. 2012), and *Vinning-El v. Evans*, 657 F.3d 591 (7th Cir. 2011), for this proposition.

In *Grayson*, an inmate-adherent of the African Hebrew Israelites of Jerusalem was forced to cut off his dreadlocks "on

---

[33] R.84 at 7–8.

[34] Appellant's Br. 35–36 (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam)).

the ground that they posed a security risk." 666 F.3d at 451. Grayson claimed that not cutting his hair was an element of his faith; specifically, he informed prison officials that he had taken "the Nazarite vow of separation," which required him to refrain from cutting his hair. *Id*. at 454. The prison chaplain denied Grayson's request to grow out his hair because wearing dreadlocks was not a required element of the African Hebrew Israelites of Jerusalem. The chaplain acknowledged that Rastafarians were allowed to have dreadlocks, but distinguished their situation because having dreadlocks was a requirement of their faith. On appeal, we observed that Grayson's act of not cutting his hair could have been a legitimate aspect of his personal faith. We explained that "[p]rison authorities are always entitled to balance security concerns against religious practices, and the need to do so may be greater with regard to optional than to mandatory practices." *Id*. at 455. Nevertheless,

> [p]rison chaplains may not determine which religious observances are permissible because orthodox. … No more can the prison permit Rastafarians to wear long hair and without justification forbid a sincere African Hebrew Israelite of Jerusalem to do so, even if he is more zealous in his religious observances than his religion requires him to be.

*Id*.

We reached a similar result in *Vinning-El*. *Vinning-El* involved an MSTA inmate who asked for a vegan diet as a religious accommodation. The chaplain denied the request, "observing that the tenets of [the MSTA] require a non-pork diet," not a vegan one. 657 F.3d at 592. Vinning-El sued, and

the district court denied the chaplain qualified immunity. On appeal, we observed that the district court had not made any findings concerning the chaplain's motivations in denying Vinning-El's request. The chaplain could have denied the request because he did not believe that a vegan diet was a tenet of the MSTA faith, or he could have denied it because he did not believe that the request was being made on religious grounds. If the former, the chaplain was not entitled to qualified immunity because it was clearly established at the time of the denial that "[a] personal religious faith is entitled to as much protection as one espoused by an organized group." *Id*. at 593. However, if the latter, then the chaplain had not violated the inmate's rights because mere dietary preferences, unrelated to religious observances, need not be accommodated. Absent a determination as to the chaplain's reasoning, we could not resolve the qualified immunity question and therefore remanded the case to the district court. *See id*. at 595.

Neither *Grayson* nor *Vinning-El* speak to the circumstances before us today. In both cases, the individual inmate requested that his religious belief be accommodated even though that belief was arguably personal to him and more demanding than the ones generally followed by adherents of the religion with which he professed to be affiliated. Mr. Neely-Bey presents a very different situation. He does not ask the CIF to accommodate a personal belief not required of MSTA adherents. Rather, he asks that the CIF require the MSTA to accept him as a full member even though his belief system as a declared sovereign citizen differs substantially from that of the MSTA and MSTA liturgical practices require that its adherents share their religious beliefs in the course of their worship services. The MSTA consequent-

ly believes that admitting Mr. Neely-Bey as a member would challenge its teachings and, possibly, jeopardize its status.

This is the crux of the defendants' position: They maintain that, had they required the MSTA to allow Mr. Neely-Bey to participate as a full member in Friday services, they would have violated MSTA's associational rights. *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

In *Dale*, a former Eagle Scout "applied for adult membership in the Boy Scouts" as an assistant scoutmaster. *Id*. at 644. The BSA initially approved the application, but later revoked his membership after discovering that Dale was homosexual and had taken public stances in favor of gay rights. According to the BSA, being a homosexual was antithetical to its mission. Dale then instituted a state-court action claiming that the BSA's revocation of his membership violated New Jersey's law prohibiting discrimination in public accommodations. The New Jersey Supreme Court agreed with Dale and further held that requiring BSA to accept Dale as a scout leader did not violate BSA's right to association under the First Amendment.

The Supreme Court reversed. It observed that "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id*. at 648. In assessing whether this was the case, the Court explained that deference is owed to the group's formulation of its "goals and philosophy," as well as its "view of what would impair its expression." *Id*. at 651, 653. Because the BSA believed that its principles precluded the practice of homosexuality and because "Dale's presence in the [BSA] would … force the or-

ganization to send a message … that [it] accepts homosexual conduct as a legitimate form of behavior," "the forced inclusion of Dale would significantly affect its expression." *Id*. at 653, 656.

Mr. Neely-Bey believes that the defendants' reliance on *Dale* is misplaced. Dale, he contends, was in a leadership role, whereas he only was asking to participate as a member of the MSTA. The Court in *Dale*, however, did not limit its discussion to leaders of organizations, but instead asked whether "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association." *Id*. at 648. Although the relative position of the individual in a group may bear on whether the group's inclusion of the individual "affects in a significant way the group's ability to advocate public or private viewpoints," *id*., the Court spoke in terms of "membership" as well as leadership, *see id*. at 654–56. Moreover, the record reflects that, as a full member of the MSTA, Mr. Neely-Bey would be speaking to other members of the congregation and commenting on the words of the Prophet and passages of the Koran. Requiring the MSTA to allow an individual to speak at its worship services when that person holds beliefs antithetical to its own would significantly affect its ability to preserve and pass on its message.

Here, Chaplain Smith and the enforcement officers were required to balance the religious practices of one adherent against the rights of other inmates to exercise their religious beliefs in accordance with MSTA teaching. Neither *Grayson* nor *Vinning-El* offers guidance for correctional officers who find themselves in this dilemma. Indeed, there do not appear to be any cases that instruct prison officials on how they

should strike the appropriate balance between these competing interests.[35] As we have explained previously, "[p]ublic officials can be held liable for violating clearly established law, but not for choosing sides on a debatable issue." *O'Keefe v. Chisholm*, 769 F.3d 936, 942 (7th Cir. 2014). The district court, therefore, did not err in granting the defendants qualified immunity on Mr. Neely-Bey's damages claims under the Free Exercise Clause.[36]

## 2. Claim for Injunctive Relief

Mr. Neely-Bey next submits that, even if the district court correctly granted qualified immunity to the defendants on his claim for damages, it failed to recognize that his complaint also stated a claim for injunctive relief under both the Free Exercise Clause and under RLUIPA. Moreover, Mr. Neely-Bey continues, qualified immunity does not protect the defendants from a claim for injunctive relief. *See Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012). Consequently, he contends, a remand is necessary

---

[35] Indeed, Mr. Neely-Bey notes that "Defendants have cited no decision suggesting the government can rely on a group's associational interests to limit an individual's participation in religious services, based solely on his expression of allegedly unorthodox beliefs." Appellant's Br. 31. That courts have not had to grapple with this difficult issue would seem to counsel the application of qualified immunity.

[36] Notably, the defendants make only a passing reference to whether allowing Mr. Neely-Bey to participate as a full member of the religion would jeopardize the security or rehabilitative concerns of the institution. For reasons not at all clear to us, with the exception of this single, oblique reference in its appellate brief, this contention, which may well have merit, is never developed.

for the district court to consider the merits of his claim for injunctive relief.

Mr. Neely-Bey's complaint, among other relief, asks that the defendants "cease all action against [him]."[37] When the district court screened Mr. Neely-Bey's complaint under 28 U.S.C. § 1915A, it nevertheless acknowledged only that he was "seek[ing] monetary relief"; the court made no mention of Mr. Neely-Bey's prayer for injunctive relief.[38] Proceeding on the assumption that Mr. Neely-Bey's claims were for monetary relief alone, the court dismissed the claims against Commissioner Lemmon and Superintendent Knight in their official capacities as barred by the Eleventh Amendment and directed that these defendants be removed from the docket. The court allowed only the damages claims against Chaplain Smith and Officers Conley and Sidwell to go forward. Mr. Neely-Bey moved for reconsideration of the screening order, but not on the ground that the district court had mis-read his complaint to include only claims for damages.

### a.

Before us, the defendants at least tacitly acknowledge that Mr. Neely-Bey's complaint requested injunctive relief.[39] They assert, however, that Mr. Neely-Bey abandoned his claim for injunctive relief by not raising the issue in his mo-

---

[37] R.1 at 6.

[38] R.13 at 2.

[39] *See* Appellees' Br. 28 (noting that the district court believed that Mr. Neely-Bey was seeking only damages and acknowledging that "this assumption may have been a mistake").

tion to reconsider or in his response to the motion for summary judgment.

It is the general rule that a litigant does not abandon an argument by failing to raise it in a motion to reconsider. *Hamer v. Neighborhood Hous. Servs. of Chi.*, 897 F.3d 835, 838 (7th Cir. 2018) ("And it is never necessary to remonstrate with a judge after an order has been entered. Motions for reconsideration are discretionary, not obligatory."). The defendants nevertheless submit that, "where a plaintiff is seeking relief from judgment that is most appropriately awarded by a trial court on a Rule 60 motion, such as where the plaintiff is claiming oversight, mistake or clerical error, the plaintiff may waive his right to present that type of argument on appeal if he did not make the appropriate Rule 60 motion below." *Denius v. Dunlap*, 209 F.3d 944, 958–59 (7th Cir. 2000). Here, they contend, the district court seems simply to have misread or overlooked the full extent of Mr. Neely-Bey's claims, and such an oversight falls neatly within the coverage of Rule 60(b)(1).[40] Consequently, the defendants submit that, because Mr. Neely-Bey failed to raise the district court's oversight in a Rule 60(b) motion, he cannot now pursue his claim for injunctive relief.

We do not believe that *Denius* compels this result. First, the language on which the defendants rely was not part of our holding. After discussing what *might be* the effect of De-

---

[40] Federal Rule of Civil Procedure 60(b)(1) provides: "(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect[] …."

nius's failure to file a Rule 60(b) motion *if* the court had overlooked his claim for injunctive relief, we explained that this, in fact, had not occurred: "This is not a case where the district court completely overlooked plaintiff's claims for equitable relief." *Id.* at 959. Rather, we observed, the district court very clearly had disposed of both "Denius's claims for monetary and equitable relief through its summary judgment opinion." *Id.* Thus, we did not have to decide whether Denius's actions constituted waiver (or abandonment) because the nature of the district court's error did not fall within the language of Rule 60(b).

Additionally, our discussion in *Denius* focused on the effect of failing to bring a Rule 60(b) motion. Rule 60(b), however, governs motions that seek to "'relieve a party or its legal representative from a *final* judgment, order, or proceeding' for the enumerated reasons." *Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (quoting Fed. R. Civ. P. 60(b)). The operative order here, however, was the district court's screening order, which was interlocutory. *See DaSilva v. Rymarkiewicz*, 888 F.3d 321, 323 (7th Cir. 2018). It was in that order that the court narrowed the scope of the action to include only claims for damages. When the defendants later moved for summary judgment, they reasonably focused their motion on the claims for damages—the only ones still before the court. Mr. Neely-Bey's response, as well, was directed to the claims for damages. There was no obvious way for Mr. Neely-Bey to revisit the dismissed claims in the briefing on the summary-judgment motion. Moreover, it was the district court's summary-judgment ruling that immediately preceded its entry of final judgment, the triggering event for a Rule 60(b) motion. Under these circumstances, Mr. Neely-Bey was not required to seek relief under Rule

60(b) for the district court's *sua sponte* dismissal of his claims for injunctive relief. Consequently, Mr. Neely-Bey has not waived, or otherwise abandoned, his claim for injunctive relief under the Free Exercise Clause.[41]

---

[41] Mr. Neely-Bey's situation is readily distinguishable from the other cases on which the defendants rely. *See Heiar v. Crawford Cnty*, 746 F.2d 1190, 1196 (7th Cir. 1984); *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335 (5th Cir. 2015). In *Heiar*, we held that the defendants had waived their statute-of-limitations defense because, although included in the answer, they never again raised it—in a dispositive, pretrial motion, as an item in the pretrial order, or in a motion for judgment at trial. *See* 746 F.2d at 1196. Here, however, the district court eliminated the claim for injunctive relief *sua sponte*, and there was no clear opportunity for Mr. Neely-Bey to raise the issue again with the district court before the entry of final judgment. In *Peterson*, the plaintiff's complaint had included a prayer for "[a]ny further legal and equitable relief to which Peterson may be justly entitled." 806 F.3d at 339 (alteration in original). However, Peterson did not request specific injunctive relief until after a jury verdict in his favor. The district court granted the injunction, but the Fifth Circuit reversed and vacated the injunction. The Fifth Circuit explained that the defendant had been prejudiced by Peterson's inaction because, had it known that injunctive relief was at issue, it would have called additional witnesses and presented evidence specifically directed to that claim for relief. However, it had been deprived of that opportunity by the plaintiff's failure to raise the issue earlier. Here, the defendants include boilerplate language that allowing Mr. Neely-Bey to renew his claim for injunctive relief "would prejudice the defendants by inhibiting their ability to defend against Neely-Bey's claims and substantially increase the defendants' potential liability." Appellees' Br. 32. However, the defendants do not explain how or why this is the case. Unlike the defendant in *Peterson*, they have not lost their ability to present evidence in opposition to this claim, and they do not explain how revival of Mr. Neely-Bey's claim for injunctive relief might substantially increase their potential liability.

**b**.

Waiver and abandonment are the only bases that the defendants have offered for affirming the district court's dismissal of Mr. Neely-Bey's claim for injunctive relief. Although "[w]e may affirm a district court's dismissal order on any basis supported by the record," *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013), we cannot conclude, on this limited record, that judgment in favor of the defendants is warranted.

To establish a free exercise claim, Mr. Neely-Bey "had to submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) (citing *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)). The Supreme Court has explained that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." *Thompson*, 809 F.3d at 380 (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Here, Mr. Neely-Bey asserts, and the defendants do not contest, that participation in Friday services, including standing to pray and discussing the words of the Prophet, are central practices of the MSTA faith. The ban enforced by the CIF prevents Mr. Neely-Bey from fully participating in the Friday services. The question therefore is whether the ban is reasonably related to a legitimate penological interest.

Mr. Neely-Bey maintains that "the *sole* reason offered by Defendants for these restrictions was enforcement of a memorandum from an outside MSTA volunteer minister."[42] According to Mr. Neely-Bey, "[i]t was, purely and simply, a reaction to perceived religious heresy," and the defendants' enforcement of religious orthodoxy "is *not* a legitimate penological interest."[43]

As we already have discussed, however, this statement does not fairly characterize the situation. Brother Doles Bey's memo simply does not request that the prison enforce any religious doctrine. It does not ask the CIF, for instance, to serve MSTA adherents only porkless meals (a requirement of the faith) and to enforce that abstinence through discipline. Instead, the memo simply requested that the CIF allow the MSTA to choose those who may speak authoritatively on matters of faith. Therefore, contrary to Mr. Neely-Bey's assertion, there is evidence in the record to establish that the CIF's actions were motivated by a desire to protect the rights of other MSTA adherents at the CIF. The memorandum from Brother Doles Bey clearly articulates a concern that, if Mr. Neely-Bey, a professed sovereign citizen, were allowed to speak at MSTA services, the congregation of worshippers might be disbanded. It also refers to the need for the MSTA to conduct the Friday prayer services in accordance with the requirements of its tradition.[44]

---

[42] Appellant's Br. 28.

[43] *Id.* at 28–29.

[44] *See* R.81 at 72 ("The Acting Chairman presides over the[] meetings and makes sure that the meeting is opened and closed according to the laws

(continued … )

Although the term "penological interests" is most typically articulated in terms of a penal institution's interest in security and financial stability, it is well-established that the term also encompasses far wider concerns of just governance in the penal setting. *See, e.g.*, *Beard v. Banks*, 548 U.S. 521, 530–32 (2006) (plurality opinion) (holding that encouraging progress toward rehabilitation serves legitimate penological objectives); *Jones v. Brown*, 461 F.3d 353, 364 (3d Cir. 2006) (noting that "the health and safety of inmates … are legitimate penological interests"); *Goodwin v. Turner*, 908 F.2d 1395, 1399–1400 (8th Cir. 1990) (holding that treating male and female inmates equally furthered a legitimate penological interest). We have no doubt that the term also involves the protection of the constitutional rights of other prisoners. Indeed, prison officials are under a constitutional duty to protect those rights. We therefore have no doubt that the prison officials are on solid ground in maintaining that they have a right, and indeed an obligation, to protect the right of other prisoners who adhere to the MSTA faith to worship in a congregational manner to the extent that such a practice is consistent with other penal objectives.

Of course, in asserting such an objective and in choosing a means to achieve such an objective, *Turner v. Safley*, 482 U.S. 78, 89–90 (1987), teaches that prison officials cannot rely on the mere incantation of a penal interest but must come forward with record evidence that substantiates that the in-

---

( … continued)
and Customs of the Moorish Science Temple of America, Inc. and sets the tone for services to flow smoothly and without [sic] from the body/membership; and guests.").

terest is truly at risk and that prison officials have chosen an appropriate manner to assert that interest. Before us, the defendants justify their actions only in terms of the MSTA's rights without any reference to the possible impact on the security, operations, or finances of the CIF. Under such circumstances, we cannot conclude that the defendants have articulated a legitimate "penological" reason for denying Mr. Neely-Bey full participation in MSTA's Friday services.[45]

The merits of Mr. Neely-Bey's claim for injunctive relief therefore remain an open question. In considering this question, the district court should not only determine the propriety of injunctive relief under the Free Exercise Clause, but possible relief under RLUIPA. We have observed that, when a pro se prisoner asserts a claim under the Free Exercise Clause, the district court should interpret that constitutional claim to include a statutory claim under RLUIPA. *Grayson*, 666 F.3d at 451.[46] RLUIPA prohibits prison officials from

---

[45] In writing the Report of Conduct, Chaplain Smith interpreted Mr. Neely-Bey's actions as intending to interfere with and disrupt MSTA services on Holy Days. *See* R.81 at 73. Avoiding disruption of, and interference with, the meetings of authorized groups at the CIF is a legitimate penological interest. However, as already discussed, the defendants have not argued that this was a consideration in the action they took against Mr. Neely-Bey.

[46] Although damages are not available under RLUIPA, injunctive relief is. *See Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). Thus, because sovereign immunity and qualified immunity protect government officials only from damages suits, those doctrines cannot protect officials from claims for injunctive relief brought under RLUIPA. *See Sorrentino v. Godinez*, 777 F.3d 410, 415 (7th Cir. 2015) ("Sovereign immunity normally does not bar suits for injunctive relief in federal court alleging that a state official violated the federal constitution or laws."); *Hannemann v. S. Door*

(continued … )

"impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person … is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Because RLUIPA "confers greater religious rights on prisoners than the free exercise clause has been interpreted to do," *Grayson*, 666 F.3d at 451, it is possible that Mr. Neely-Bey is entitled to statutory injunctive relief even if he cannot establish a right to relief under the Free Exercise Clause.

A word of caution. On remand, the district court first should consider whether subsequent events have rendered Mr. Neely-Bey's claims for injunctive relief moot. Prior to oral argument, the defendants notified us that Mr. Neely-Bey had been transferred from the CIF to the Westville Correctional Facility. At oral argument, counsel for the defendants suggested that the transfer rendered Mr. Neely-Bey's claims for injunctive relief moot. However, there is no evidence in the record regarding how Mr. Neely-Bey's transfer will affect his ability to participate in MSTA worship. Moreover, we do not know the likelihood of Mr. Neely-Bey being transferred back to the CIF. *See Young v. Lane*, 922 F.2d 370, 373–74 (7th Cir. 1991) (noting that the likelihood of being transferred back to an institution is a factual determination for the district court). We leave it, therefore, to the district court to determine on a more devel-

---

( … continued)
*Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012) ("[T]he defense of qualified immunity does not protect defendants from an action for injunctive relief.").

oped record the effect of Mr. Neely-Bey's transfer on his claims for injunctive relief under the Free Exercise Clause and RLUIPA.

In sum, we agree with the district court that the defendants are entitled to summary judgment on Mr. Neely-Bey's claims for damages under the Free Exercise Clause. However, the district court failed to consider Mr. Neely-Bey's claims for injunctive relief under either the Free Exercise Clause or under RLUIPA. We therefore remand to the district court for further consideration of these claims in the first instance, including the effect of any subsequent events on Mr. Neely-Bey's claims for injunctive relief.

## B. Establishment Clause

Mr. Neely-Bey also maintains that the district court erred in failing to address his Establishment Clause claim. He further asserts that, had the district court considered the claim, it would have concluded that the defendants violated the Establishment Clause in enforcing Brother Doles Bey's prohibition against his full participation in MSTA meetings.

Mr. Neely-Bey is correct that the district court's order granting the defendants' motion for summary judgment did not explicitly mention the Establishment Clause. However, it did speak more broadly of whether the defendants' actions had violated Mr. Neely-Bey's "rights under the First Amendment."[47] It concluded that there was no controlling authority "directly establishing that the defendants' conduct in this case, where state officials enforced a ban from partici-

---

[47] R.84 at 8.

pating in religious activities that was put in place by the religious entity itself, violated Mr. [Neely-Bey's] rights under the First Amendment."[48] It therefore granted qualified immunity to the defendants. We turn, therefore, to the question whether the defendants are entitled to qualified immunity on Mr. Neely-Bey's claim under the Establishment Clause.

**1.**

Mr. Neely-Bey submits that, at the time Chaplain Smith limited his participation in MSTA meetings, it was clear that such action violated the Establishment Clause. He begins by noting that then, as now, "[a] government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)). According to Mr. Neely-Bey, the defendants' actions violated all three prongs.

First, he claims that there is no secular purpose for banning him from participating in MSTA Holy Day services. Instead, he contends, the defendants' "*only* reason for imposing this restriction is a desire to enforce the religious directive of an outside volunteer minister, a directive that is based entirely on religious orthodoxy."[49] We cannot accept this submission. In determining whether a government action has a secular purpose, "a government's characterization of its purpose is entitled to deference, although courts must

---

[48] *Id.* at 7–8.

[49] Appellant's Br. 41.

ensure that the government's characterization is sincere." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 992 (7th Cir. 2006) (internal quotation marks omitted). Fairly read, the defendants have stated that their reason for giving effect to Brother Doles Bey's memo was to protect the associational rights of the MSTA to choose, in the context of a religious worship ceremony, participants and leaders of the observance. Chaplain Smith's directive to Mr. Neely-Bey makes this objective crystal clear. The directive explicitly recognizes Mr. Neely-Bey "as a guest of MST of A," who could "listen," but not instruct at MSTA meetings.[50] In protecting the rights of the other prisoners, as was their obligation, the defendants may have reinforced incidentally the tenets of that faith. There is no evidence in the record, however, their actions were designed to produce such an effect.[51]

Mr. Neely-Bey also maintains that the primary effect of the action is to advance the orthodoxy of the MSTA. He believes that his situation mirrors the "pernicious fusion" of church and state that the Court condemned in *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), and *Board of Education*

---

[50] R.81 at 78.

[51] Mr. Neely-Bey also maintains that he is being singled out because of his religious beliefs. "The restriction imposed by Defendants," Mr. Neely-Bey explains, "which prohibits [him] from speaking or standing during Friday Holy Day services while others do so[,] is not based on any neutral or generally applicable rules about conduct or even membership in religious groups or participation in religious services." Appellant's Br. 42. It is, however, based on a neutral rule—that religious associations should be able to control their own leadership and membership.

*of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994).[52]

In *Larkin*, a Massachusetts state law provided that establishments "located within a radius of five hundred feet of a church or school shall not be licensed for the sale of alcoholic beverages if the governing body of such church or school file[d] [a] written objection" to the license. 459 U.S. at 117 (internal quotation marks omitted). The Court determined that the statute resulted in an unconstitutional cessation of governmental authority to a religious institution:

> Section 16C gives churches the right to determine whether a particular applicant will be granted a liquor license, or even which one of several competing applicants will receive a license.

> The churches' power under the statute is standardless, calling for no reasons, findings, or reasoned conclusions. That power may therefore be used by churches to promote goals beyond insulating the church from undesirable neighbors; it could be employed for explicitly religious goals, for example, favoring liquor licenses for members of that congregation or adherents of that faith.

*Id.* at 125. It therefore did "not strain" the Court's "prior holdings to say that the statute can be seen as having a 'primary' and 'principal' effect of advancing religion." *Id.* at 126.

---

[52] *Id.* at 44.

Similarly, in *Kiryas Joel Village School District*, a special state law had created a school district, the lines of which were the same as the lines of property owned by a Hasidic Jewish congregation. The result was that the provision of public educational services within a district had been awarded based on religious views and was completely controlled by a religious body. The Court observed that the Free Exercise and Establishment Clauses "'compel[] the State to pursue a course of "neutrality" toward religion,' favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist.*, 512 U.S. at 696 (quoting *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93 (1973)). The statute at issue, the Court explained, "depart[ed] from this constitutional command by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally." *Id.*

In both *Larken* and *Kiryas Joel Village School District*, therefore, a formal enactment ceded a discretionary function of governance to a religious body. The CIF, however, has not ceded disciplinary authority to the MSTA. The CIF has not given the MSTA the power to discipline an MSTA member if, for instance, the member fails to attend Friday services. Instead, the MSTA asked the CIF defendants to protect its right to control the religious content of the MSTA's own meetings by determining who may or may not teach its congregants. Here, a religious entity has not been given carte blanche to administer a government program or bestow a government benefit as it sees fit.

Finally, Mr. Neely-Bey submits that the CIF's enforcement of Brother Doles Bey's memo violates the entanglement prong of the *Lemon* test. To establish excessive entanglement with religion, Mr. Neely-Bey has to "demonstrate 'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Vision Church*, 468 F.3d at 995 (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 393 (1990)). "The general rule is that, to constitute excessive entanglement, the government action must involve 'intrusive government participation in, supervision of, or inquiry into religious affairs.'" *Id.* (quoting *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 631 (7th Cir. 2000)).

Mr. Neely-Bey does not address these standards or suggest how the evidence in the record establishes the level of intrusiveness required for entanglement. Instead, he submits that *Nelson v. Miller*, 570 F.3d 868 (7th Cir. 2009), necessitates such a finding of entanglement.

In *Nelson*, an Illinois inmate had requested a meatless diet on Fridays as an act of penance in accordance with his Catholic faith. The correctional facility's chaplain, Miller, reviewed the request, "cross-checking the inmate's declared religious affiliation to determine if a religious diet was required"; specifically, he "looked for confirmation of the religious dietary tenet 'on paper'—that is, he looked for confirmation of the requirement in some 'church document'—as opposed to inquiring regarding the spiritual goals of the inmate." *Id.* at 872. The prison chaplain denied the request, and, in his denial, he "cited several Bible passages purportedly contradicting Nelson's beliefs regarding penance." *Id.* at

881. Eventually, at the direction of the warden, Nelson received a vegan diet.

Nelson filed an action against Miller and several other administrators at the correctional facility, alleging, among other claims, a violation of the Establishment Clause. Specifically, Nelson alleged that Miller had "favored Muslim and African Hebrew Israelite prisoners by approving vegan diets for those prisoners without obtaining written verification that such diets were required by their religions." *Id.* at 880–81. The district court, however, "found that Nelson had not proven a violation of the establishment clause because there were valid neutral reasons for Miller's actions in this regard." *Id*. at 881. On appeal, we agreed with the district court. We explained that the correctional facility's regulations

> provided that prisoners could abstain from "any foods the consumption of which violates their required religious tenets" and the district court concluded that Miller had required documentation because he was unfamiliar with any Catholic "required religious tenet" which necessitated a non-meat diet. Under the district court's reasoning, Miller did not ask Muslim and African Hebrew Israelite prisoners to submit verification because he understood from his experience that a limited diet was part of many of these prisoners' religious practice.

*Id*.

Nevertheless, we observed, Miller's denial, which "cited several Bible passages purportedly contradicting Nelson's

beliefs regarding penance, improperly entangled [Miller] in matters of religious interpretation. It simply [wa]s not appropriate for a prison official to argue with a prisoner regarding the objective truth of a prisoner's religious belief." *Id.*

We fail to see *Nelson*'s application to the circumstances here. Chaplain Smith did not undertake his own review of MSTA doctrine. Rather, he was told by the MSTA minister at the CIF, Brother Doles Bey,[53] that Mr. Neely-Bey's profession of sovereign citizenship[54] precluded him from full membership and participation in the MSTA. This tension between the tenets of the MSTA and the sovereign-citizen movement is well documented in our case law. *See Bey v. State*, 847 F.3d 559, 560–61 (7th Cir. 2017). Chaplain Smith accepted the statement of the MSTA representative; he made no commentary at all concerning the "objective truth" of Mr. Neely-Bey's beliefs. He simply forbade him from disrupting the MSTA service.

In sum, at the very least, Chaplain Smith did not act in a manner inconsistent with existing precedent. *See al-Kidd*, 563 U.S. at 741. Consequently, we affirm the district court's judgment granting qualified immunity to the defendants on Mr. Neely-Bey's claims for damages under the Establishment Clause.

---

[53] Again, there is no question that Brother Doles Bey is the designated representative of the MSTA at the CIF. *See supra* note 9.

[54] As noted previously, *see supra* note 8, Mr. Neely-Bey's profession of sovereign-citizen beliefs is not at issue here.

**2**.

As we already have noted, qualified immunity protects the defendants only against claims for damages; it does not protect the defendants against claims for injunctive relief. *See Hannemann*, 673 F.3d at 758. The district court failed to recognize Mr. Neely-Bey's claims for injunctive relief and, therefore, never addressed the merits of those claims. On appeal, the defendants, as well, have failed to address the merits of Mr. Neely-Bey's claims for injunctive relief under the Establishment Clause. They simply maintain that Mr. Neely-Bey has waived or abandoned any claims for injunctive relief—a contention we already have rejected.

If the record contained any evidence that might support the granting of injunctive relief, we would vacate the district court's judgment in this respect and remand for further proceedings. However, as our earlier discussion of Mr. Neely-Bey's Establishment Clause argument demonstrates, the record is entirely devoid of any evidence that might form the basis for such a claim. Consequently, the district court need not revisit the matter of injunctive relief on remand.

## Conclusion

For the foregoing reasons, we affirm the district court's judgment regarding Mr. Neely-Bey's claims for damages under the Free Exercise and Establishment Clauses. We also direct the district court to enter judgment for the defendants on Mr. Neely-Bey's claims for injunctive relief under the Establishment Clause. However, we remand the case to the district court for it to consider, in the first instance, Mr. Neely-Bey's claims for injunctive relief under the Free

Exercise Clause and under RLUIPA. In undertaking this task, the district court first should ensure that the controversy has not become moot.

The parties shall bear their own costs of this appeal.

AFFIRMED in part; REMANDED in part